493 A.2d 101

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Richard Allen CAMPBELL.**

Superior Court of Pennsylvania.

Argued March 13, 1985.

Filed May 17, 1985.

Charles S. Hersh, Assistant District Attorney, Hermitage, for Commonwealth, appellant.

Lorinda L. Hinch, Assistant Public Defender, Mercer, for appellee.

Before BECK, POPOVICH and HANDLER, JJ.*

POPOVICH, Judge:

This is an appeal by the Commonwealth from the order of the Court of Common Pleas of Mercer County granting Richard Allen Campbell, appellee, a new trial. We affirm.

The Commonwealth, as the verdict-winner in a trial where the jury found the appellee guilty of statutory rape and incest, is entitled to have the evidence viewed in a light most favorable to it. *Commonwealth v. Jackson,* 506 Pa. 469, 485 A.2d 1102 (1984). Viewed in accordance with the preceding standard, the following evidence appears of record: On July 8, 1982, the Campbell children (Terry, age 10; David, age 7; and Rosella, age 11) were watching television at their Madison Street home in Sharon, Pennsylvania until 8:30 p.m. before being directed to go to bed by the appellee, their natural father. Mrs. Campbell, as was her custom on Thursdays, had gone to play bingo at the Eagles and was not expected back until 10:00 or 11:00 p.m. that evening.

After Rosella had changed into her sleeping apparel (which consisted of a robe, nightgown, shirt and underwear), the appellee came into her bedroom. Before doing so, however, the appellee had looked in on his sons, who slept on the same floor as Rosella but in a separate room.

* Judge Earl R. Handler, Senior Judge of the Court of Common Pleas of Indiana County, is sitting by designation.

Upon entering Rosella's room, the appellee was visible to her because of a nightlight. As he stood along the side of the bed, he ordered his daughter to get undressed. When she refused, he slapped her across the face. The daughter screamed. The appellee told her to "shut up" and removed her clothing. The appellee then got on top of the victim, placed his penis between her legs and, as described by the victim, "went up and down" for about one-half (½) of an hour. During this incident the victim told the appellee he was hurting her, but he did not cease until she complained a second time of the pain. Also, the victim went on to explain that the appellee penetrated her.

After the appellee got off the victim, he told her to hold his penis. She refused. The appellee reacted by striking the victim's head against the wall next to the bed. He then lifted her from the bed by her arms and caused her head to strike the wooden floor. This was followed by the victim being placed back on the bed and being told by the appellee to put his penis in her mouth. When she said, "No" he smacked her and at some point struck her with a belt in the face. This caused the victim to cry. However, the ordeal did not come to an end until a knock was heard at the front door. It was Mrs. Campbell. The appellee got dressed, told the victim to do the same and warned, "If you tell, I'll blow your head off."

At this stage of the trial, a side bar was conducted which centered upon the admissibility of an "event of a year and a half before" the one being tried involving, again, the appellee and his daughter at their residence on Walnut Street in Sharon. The trial court permitted, over the appellee's objection, the victim to testify that approximately a year and a half (1½) before the July, 1982 incident she was assaulted by the appellee. The trial court also cautioned the jury that the testimony to be given went "to demonstrate the propensity or inclination of the father to commit this kind of crime."

As the victim recalled it, her mother had gone to bingo and the appellee had required, thereafter, that she go to

bed. Once she had put on her robe, nightgown, shirt and underpants, the appellee came into her bedroom wearing just his underwear. He told the victim to get undressed, and when she would not comply he slapped her face. He then took the victim's clothing off, as well as his own. Following this, the appellee got on top of the victim and placed his penis between her legs. He commenced moving in and up and down motion for about one-half (½) hour. Although he did not achieve penetration, he did perform cunnilingus.

Subsequent to the sexual assault, the appellee told the victim to put his penis in her hand. She said, "No" and had her head struck against the nearby wall. The appellee also asked the victim to place his penis in her mouth. This never occurred. What did happen next was the appellee's wife knocked at the front door and he had to get dressed to let her in. Before doing this, however, the appellee told the victim he would "blow [her] head off if [she] told anyone." The victim never informed her mother of either incident immediately because she was "scared".

In fact, it was not until September of 1982 that the second assault was communicated to the mother by the victim. The victim's story was corroborated by her brothers, who both testified to being awaken on July 8, 1982 by the sound of their sister screaming. When they entered Rosella's bedroom, as recounted by Terry, "dad was on top of [their] sister" going "up and down". Terry also recalled the appellee putting his penis in Rosella's hand, and his sister stating "No" when being told to put it in her mouth.

Once the appellee realized that Terry and David were in the room, he told them to "get out". Terry further noted that the appellee stated, "he was going to kill [Terry] ... [i]f [he] t[o]l[d] somebody."

David, Rosella's other brother, remembers leaving the bedroom at their father's direction after witnessing him on top of his sister. The witness returned to talk to Rosella the following morning, and felt that she should tell their mother.

The victim, as noted earlier, did not come forward with what had occurred until September 25, 1982. Mrs. Campbell informed the police on the 29th or 30th of September. A few days prior thereto, the appellee left the marital domicile, something he had never done before according to Mrs. Campbell, and was not seen by her until March 5, 1983. Mrs. Campbell was of the belief that the appellee had left the area and was staying with a friend in Cleveland, Ohio. However, she was not sure.

Police efforts to locate the appellee proved futile—contact with family members concerning their interest in finding the accused resulted in no information as to his possible whereabouts. It was not until Mrs. Campbell saw her husband in March of 1983, near their residence, that she contacted the authorities. He was arrested trying to leave the area. The present charges were brought, a jury trial was conducted and a verdict finding the appellee guilty of statutory rape and incest was returned. This appeal followed the entry of the trial court's order awarding appellee a new trial.

The only issue we need concern ourselves with is whether the trial court abused its discretion in awarding the appellee a new trial "in the interest of justice", after concluding that it had erroneously admitted evidence of the appellee's purported sexual attack of the victim on a date other than the one for which he was being tried. *See Commonwealth v. Patterson*, 484 Pa. 374, 399 A.2d 123 (1979).

■ In Pennsylvania, it is axiomatic that evidence of other unrelated criminal conduct of an accused is generally inadmissible at trial *except in certain limited circumstances. Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983). Our Supreme Court ruled in *Commonwealth v. Bell*, 166 Pa. 405, 31 A. 123 (1895) that a prosecution for incest was such an exception. In particular, the Court was faced with the issue of whether, in a prosecution for incestuous fornication, it was competent for the Commonwealth to introduce evidence of illicit relations between the parties

prior to the commission of the specific offense laid in the indictment. It held:

> If an act is so remote in point of time from the act laid in the indictment that the statute of limitations would protect the participants in it in case of their prosecution for it, it is still admissible if it is one of a series of acts indicating continuousness of sexual intercourse.... We conclude therefore that it was proper for the [C]ommonwealth to introduce evidence of prior illicit relations between the parties although such evidence disclosed other indictable offen[s]es of like nature which were barred by the statute of limitations.

166 Pa. at 412, 31 A. at 123, 124. We find *Bell* to be controlling in the case before us.

To commence with, we note that no one disputes that the period of a year and a half (1½) between the two offenses instantly is erroneous. For example, the victim testified that her family had lived at the Madison Street address for three (3) years prior to the July 8, 1982 incident. She also remarked to being born on June 8, 1971, that the first assault took place in her previous residence on Walnut Street, and that she was in the 1st grade and eight (8) years old at the time. Thus, because the victim had been held back a year in each of the 1st and 2nd grades, a more accurate accounting of the passage of time between the two incidents would appear to be 3 or 4 years. (*See* Trial Court Opinion at 9; Appellant's Brief at 14)

We concede that remoteness is but another factor to be weighed in deciding if the prior crime tends to show that the same person committed both crimes, and that the degree of similarity between the two incidents necessary to prove common identity of the perpetrator is inversely proportional to the time span between the two crimes. *Commonwealth v. Clayton*, 506 Pa. 24, 483 A.2d 1345 (1984); *Commonwealth v. Ulatoski*, 472 Pa. 53, 371 A.2d 186 (1977). Also, we admit that no rigid rule has been formulated for determining when such evidence is no longer relevant, and that the remoteness of prior instances of relations

between the defendant and victim affects the weight of that evidence and not its admissibility. *Commonwealth v. Petrakovich,* 459 Pa. 511, 524, 329 A.2d 844, 850 (1974); *Commonwealth v. Clark,* 280 Pa.Super. 1, 421 A.2d 374 (1980); Henry on Pennsylvania Evidence, § 309 (4th Ed. 1953).

Nonetheless, our sedulous review of the law in this jurisdiction, dealing with incest, statutory rape and indecent assault, has failed to unearth one decision condoning the admission of a *single,* prior accounting of a sexual assault (so distant in time as the one at bar) to buttress a prosecutrix's complaint of a subsequent sexual assault charged against the same assailant where there is no evidence of a continuous course of conduct linking the incidents of molestation. *See, e.g., Commonwealth v. Ritchie,* 324 Pa.Super. 557, 472 A.2d 220 (1984) (Court did not err in allowing appellant's daughter to testify that he had been sexually molesting her three or four times a week for a period of four years); *Commonwealth v. Neimetz,* 282 Pa.Super. 431, 422 A.2d 1369 (1980) (Trial court did not err when it admitted into evidence testimony regarding incidents of sexual abuse allegedly occurring beyond the statute of limitations; appellant's stepdaughter related a long and sordid narrative of her childhood); *Commonwealth v. Buser,* 277 Pa.Super. 451, 419 A.2d 1233 (1980) (Evidence of appellant's prior sexual abuse of his daughter starting when she was 8 or 9 to 13 years of age fit within the limited exception of *Bell* ); *Commonwealth v. Leppard,* 271 Pa.Super. 317, 413 A.2d 424 (1979) (Appellant's sexual assault of his daughter over a period of 4 years was admissible to convict him of incest).

The aforementioned rulings are consistent with the seminal case of *Commonwealth v. Bell, supra,* where, it must be remembered, a father was charged with incestuous fornication with his daughter, and evidence of a number of prior offenses with the same daughter was admitted as a "series of acts indicating continuousness of sexual intercourse", under the "sequence of acts" theory.

■ Instantly, we have, unlike in *Bell* and its progeny, a single instance of sexual abuse separated from the present charge by a period of 3–4 years. Next, we see that the appellee did not take the stand to refute the assault charge. Lastly, we cannot overlook the fact that the victim was not the sole witness to the July, 1982 assault. Her brothers, Terry and David, unequivocally testified to hearing their sister scream on the night in question, going into her bedroom and seeing their father on top of the victim going in an up and down motion. Thus, we fail to see the need for the introduction of the "other crime" by the prosecution. *Compare Commonwealth v. Claypool*, 317 Pa.Super. 320, 464 A.2d 341 (1983); *Commonwealth v. Rough*, 275 Pa.Super. 50, 418 A.2d 605 (1980); *Commonwealth v. Hodge*, 270 Pa.Super. 232, 411 A.2d 503 (1979); *Commonwealth v. Wright*, 259 Pa.Super. 93, 393 A.2d 833 (1978).

Although the jury could have, and might have, convicted the appellee without hearing the testimony of the victim regarding the 3–4-year-old assault charge, nevertheless, the appellee is entitled to a trial without being prejudiced by such testimony. *See Commonwealth v. Boulden*, 179 Pa. Super. 328, 116 A.2d 867 (1955); *see also Commonwealth v. Bradley*, 243 Pa.Super. 208, 364 A.2d 944 (1976). Also, in balancing the unsubstantial Commonwealth interests against the appellee's strong interest in not being convicted because he is a "bad person", we find that the appellee's interest must prevail. *See Commonwealth v. Claypool, supra; Commonwealth v. Hude*, 256 Pa.Super. 439, 390 A.2d 183 (1978); McCormick on Evidence, § 190 at 565 (3rd Ed.1984). And, as for the cautionary instruction, it did little to mitigate the prejudicial effect of the evidence presented. *Cf. Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Justice Jackson said of limiting instructions by the trial judge: "The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction.").

Further, the testimony complained-of is exactly the type of "other crimes" that appeals to a jury's emotions and leads to a conviction because of a person's supposedly bad character. Thus, we cannot conclude that the evidence of guilt was so overwhelming, and the error of admitting the prejudicial testimony so insignificant by comparison, that the error was harmless beyond a reasonable doubt. *See Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978); *Commonwealth v. Claypool, supra.* Accordingly, we are in agreement with the trial court that the appellee should be awarded a new trial.

Order affirmed.